# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

The State, Respondent,

v.

Derrick Tyler Mills, Petitioner.

Appellate Case No. 2022-001254

―――――――

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

―――――――

Appeal from Calhoun County
Maite Murphy, Circuit Court Judge

―――――――

Opinion No. 28220
Heard May 1, 2024 – Filed July 24, 2024

―――――――

## AFFIRMED IN RESULT

―――――――

Tommy Arthur Thomas, of Irmo, for Petitioner.

Attorney General Alan McCrory Wilson and Senior
Assistant Attorney General Mark Reynolds Farthing,
both of Columbia; and Solicitor David Michael Pascoe
Jr., of Orangeburg, all for Respondent.

―――――――

**JUSTICE KITTREDGE:** This criminal appeal arises out of the trial court's
decision to recall the jury and accept a verdict after the court declared a mistrial and

discharged the jury. Under the particular facts of this case, we find no abuse of discretion in the trial court's decision to reassemble the jury and enter a verdict, for the recall served the limited purpose of confirming a verdict the jury reached prior to discharge. Accordingly, we affirm Derrick Mills's (Petitioner) conviction for armed robbery.

## I.

In December 2014, Petitioner and his son, Quintin, met Charles Brown purportedly to sell a motorcycle. According to the State, after the transaction fell through, the men robbed Brown, allegedly shooting and killing him in the process. Following the incident, the State indicted Petitioner and Quintin each with murder and armed robbery. The father and son subsequently proceeded to a jury trial as joint defendants.

At the close of the joint trial, the trial court explained the role of the indictments and guided the jury on how to properly render its verdicts:

> [T]he indictments in this case allege two different offenses against both Defendants. Each indictment charges a separate and a distinct offense. You must decide each indictment separately on the evidence and the law applicable to it, uninfluenced by your decision as to any other indictment.
>
> The Defendants may be convicted or acquitted on any or all of the offenses charged. You will be asked to write a separate verdict of guilty or not guilty for each indictment. I charge you that our two Defendants in this case, both of whom are charged with murder and armed robbery -- the case of each Defendant, the evidence and the law concerning the Defendants, should be considered separately and individually. . . .
>
> Where more than one person is charged with a crime, if the evidence warrants it, you may convict one and acquit the other or you may acquit both or you may convict both. It will . . . depend upon your view of the testimony and the evidence. You must take each Defendant and consider the evidence as to that Defendant and my instructions to you on the law. You will then write a separate verdict of guilty or not guilty on each individual Defendant.

The trial court further explained the jury would receive two separate verdict forms—

one for each defendant—where it would enter its verdicts. As to the indictments, the trial court explained, "You will also have in the jury room . . . a copy of each of the indictments. On the front of the indictment there is a section for each [defendant] that says 'verdict.' If you would, *write the appropriate verdict, sign, and date the indictment*." (Emphasis added). Equipped with those instructions, the jury retired to deliberate.

Hours later, the jury asked the trial court, "What happens if we can't come to an agreement on one case?" In response, the trial court advised the jury that the court would receive its verdict "on one case" and would provide further instructions regarding "the other." The jury then returned to the courtroom, at which point its verdicts as to the charges against Quintin were announced, convicting him of armed robbery but acquitting him of murder.

Shortly thereafter, without objection, the trial court issued an *Allen*[1] charge. After further deliberations, the jury again wrote the trial court, stating, "We cannot reach an agreement and no one will change their mind." At that juncture, outside of the presence of the jury, the trial court notified the parties of its intent to declare a mistrial. The jury then returned to the courtroom where, after confirming the jury could not reach an agreement, the trial court declared a mistrial and excused the jury at 4:35 p.m.[2]

Moments after the jury's dismissal, a bailiff discovered three documents in the jury room, including Petitioner's (1) armed robbery indictment, (2) murder indictment, and (3) verdict form which, although covering *both* charges against him, contained only a *single* signature line. Significantly, the jury had written "guilty" on the "verdict" section of the armed robbery indictment, and the jury's foreperson had signed and dated it.[3] Similarly, on the verdict form, the jury had circled "guilty" in the space corresponding to the armed robbery charge; however, the jury did not circle an option for the murder charge, and the jury foreperson did not sign or date the verdict form.

---

[1] *Allen v. United States*, 164 U.S. 492 (1896).

[2] The parties do not contest the propriety of the mistrial on appeal.

[3] The verdict portion of the murder indictment was not similarly completed or signed.

Because it appeared from those documents that the jury had in fact reached a verdict on the armed robbery charge, the trial court ordered the immediate return of the jury. The jurors were promptly located on or in the immediate vicinity of the courthouse premises and returned to the jury room. The record reflects—and neither party disputes—all twelve jurors had returned to the jury room by 4:58 p.m. when the trial court went back on the record to inform the parties of what happened.

At that point, the trial court told the parties it intended to ask the jury "if they were able to reach a verdict on one of the two charges and if they were just deadlocked on the second charge." Petitioner objected, arguing the trial court did not have the authority to recall the jury after it granted a mistrial and discharged the jury. Petitioner requested that, in the event the trial court elected to question the jury, it "give them as little explanation [as possible] and . . . just ask them the simple question: Did you reach a verdict on one of the two charges?"

Ultimately, the trial court observed that the discovered documents tended to establish the jury had reached a verdict on the armed robbery charge prior to the mistrial and subsequent dismissal and that it would be a "miscarriage of justice" for the court to simply ignore that.[4] The trial court accepted Petitioner's request to ask only whether the jury was able to reach a verdict as to the armed robbery charge.

The jury returned to the courtroom at 5:12 p.m. at which point the trial court explained that the documents had been discovered and asked, "*Before you were released*, did you come to a verdict on one charge, but were deadlocked on the second charge?" (Emphasis added). Every member of the jury nodded their heads in affirmation. The trial court further inquired,

> [D]id you come to a verdict on the charge of armed robbery *prior to me releasing you* for the mistrial and were deadlocked as to the charge of murder? If that is what happened and *that is still what you believe*, if

---

[4] The trial court additionally ventured to explain what occurred prior to the grant of the mistrial, noting its question to the jury at that point was "were you able to reach a verdict?"—as opposed to a specific question to determine whether the jury was able to reach a verdict on each of the indictments. From that, the trial court reasoned, "It appears that they were putting the case of one defendant as a whole rather than on each separate and distinct offense."

you would please stand and raise your hand.

(Emphasis added).  On the record, the trial court specified that all twelve jurors stood and acknowledged that they reached a verdict on the armed robbery charge but not the murder charge prior to their dismissal.  At Petitioner's request, the trial court individually polled the jury, asking each juror whether the guilty verdict as to Petitioner's armed robbery charge was previously—and remained—their verdict.  All twelve jurors independently confirmed they reached a guilty verdict as to the armed robbery charge before they were discharged and that this remained their verdict following their reassembly.  As a result, the trial court announced the guilty verdict for the armed robbery charge and sentenced Petitioner accordingly.[5]

Petitioner appealed his conviction for armed robbery to the court of appeals, arguing the trial court erred when it recalled the jury following discharge and received the jury's guilty verdict on the armed robbery charge.  The court of appeals affirmed Petitioner's conviction on a procedural bar.  *State v. Mills*, Op. No. 2022-UP-309 (S.C. Ct. App. filed July 20, 2022).  We granted a writ of certiorari to review the court of appeals' decision.  We elect to resolve the appeal on its merits.

## II.

### A.

The law of our state recognizes the trial court's authority to recall the jury following discharge and, depending on the circumstances, receive the jury's verdict.  *See State v. Myers*, 318 S.C. 549, 552, 459 S.E.2d 304, 305 (1995); *cf. State v. Dawkins*, 32 S.C. 17, 26, 10 S.E. 772, 772 (1890).

For example, in *Dawkins*, after the jury rendered a guilty verdict, the trial court discharged the jury and adjourned the proceedings.  The following day, the trial court recalled the jury for the purpose of instructing it as to its ability to recommend mercy, which the court had inadvertently omitted from the initial jury charge. Subsequently, despite having already reached a verdict, the jury engaged in further substantive deliberations and, ultimately, altered its guilty verdict by recommending mercy.  On appeal, we held the recall of the jury was improper under those circumstances, reasoning, "After a jury [has] rendered [its] verdict, and [has] been discharged, we

---

[5] Specifically, the trial court sentenced Petitioner to life imprisonment without the possibility of parole—the mandatory sentence based upon his prior criminal record.

know of no authority by which [it] can be reimpaneled, and, *under further instructions*, be called upon to render *a new and different verdict*." *Dawkins*, 32 S.C. at 26, 10 S.E. at 773 (emphasis added).

We reached a different result in *Myers*. There, a capital case, the jury initially recommended a sentence of life imprisonment rather than death and was discharged. However, just moments after discharge, the trial court learned that the jury had, in fact, found the existence of aggravating factors. The court recalled the jurors two minutes after discharge. During that two-minute interval, the jury did not disperse or mingle with the public and remained within the control of the clerk of court. Upon reassembly, after the trial court confirmed it mistakenly assumed the jury had not found the existence of any aggravating circumstances,[6] the jury was sent out to list any aggravating circumstances it had found prior to its discharge, returning several minutes later finding the existence of three aggravators. The trial court accordingly modified Myers's sentence.

On appeal, we first emphasized that during the two-minute interval between its discharge and reassembly, the jury remained in the clerk of court's custody as an essentially undispersed unit, not subjected to any outside influence. We reasoned those circumstances were in stark contrast to those in *Dawkins*, where the jury was discharged and dispersed overnight, "clearly presenting the opportunity for discussion of the case with others." *Myers*, 318 S.C. at 552, 459 S.E.2d at 305.

Next, we examined the function performed by the jury upon reassembly: the jury was not given any new information, nor was it required to make any additional or different findings than it had before. Rather, the jury foreperson merely confirmed the jury had in fact found the existence of aggravating circumstances *prior* to being discharged but had failed to write them down. We again distinguished *Dawkins* on the basis that the jury in that case was given a new option as to sentencing and engaged in further substantive deliberations, permitting the jury to alter the verdict it reached prior to discharge. Because "reassembly in [Myers's] case served *not to amend or alter the jury's verdict, but to reflect the actual verdict reached . . . [u]nder the limited factual circumstances presented*, we [found] no abuse of discretion in recalling the jury to permit it to accurately report its true verdict." *Id.* (emphasis

---

[6] The forewoman of the jury told the trial court the jury had indeed found the existence of aggravating circumstances but simply had not written them down as they had not recommended a sentence of death.

added).

Overall, *Dawkins* and *Myers* tell us the facts surrounding the interval between the jury's discharge and reassembly and the functions performed by the jury upon its return are crucial in determining the propriety of the decision to recall the jury and enter a post-discharge verdict.[7]  In short, a fact-intensive inquiry is required.

**B.**

We find that—under the particular facts of this case—the trial court properly exercised its discretion when it recalled the jury following discharge and entered the guilty verdict against Petitioner.  Although not identical, the facts of this case are more akin to those in *Myers* than in *Dawkins* and, ultimately, support the trial court's decision to reassemble the jury.

The jury in this case only dispersed for a very brief interval between discharge and

---

[7] This pragmatic approach—permitting post-discharge jury reassembly to ultimately enter a verdict in certain circumstances—mirrors that of other jurisdictions.  *See, e.g.*, *Gov't of Virgin Islands v. Smith*, 558 F.2d 691, 693–94 (3d Cir. 1977) (permitting reassembly despite the fact that *the jury had returned home for over a day* because, when it returned, the jury merely confirmed the verdict it reached prior to discharge); *State v. Edwards*, 552 P.2d 1095, 1098 (Wash. Ct. App. 1976) (finding no error when the trial court recalled the jury after it declared a mistrial under a mistaken impression that the jurors' deadlock extended to all charges because no member of the jury had either the time or opportunity to separate and commingle with non-jurors, nor did the jurors renew their deliberations or discuss the merits of the case (citations omitted)); *James v. State*, 453 So. 2d 786, 792–93 (Fla. 1984) (permitting reassembly even though the jury was not recalled until a week later because "[t]he jury members when reconvened, merely had to say 'yes' or 'no,' [and] they did not have to hear or consider anything more relating to the case"); *Gardner v. Commonwealth*, 350 S.E.2d 229, 232–33 (Va. Ct. App. 1986) (permitting reassembly where the jury further deliberated and altered its verdict because, in the time between discharge and reassembly, the jury remained in the presence of the court); *People v. Rushin*, 194 N.W.2d 718, 721–22 (Mich. Ct. App. 1971) (invalidating reassembly even when the jury remained undispersed and had only left the courtroom for only two minutes because the jury conducted further deliberations and altered its verdict upon return).

recall—at most twenty-three minutes.[8]  That interval pales in comparison to the one in *Dawkins* that spanned overnight.  Further, in that brief interval, each juror remained on or immediately adjacent to the courthouse premises, again standing in sharp contrast to the *Dawkins* jurors who returned to their homes following their dismissal.

More importantly, the key feature supporting the trial court's decision to recall the jury is the undisputed fact that reassembly in this case served not to amend or alter the jury's verdict, but merely to reflect the actual verdict it reached *prior* to its dismissal.  Significantly, upon its return, the jury was not asked to consider any additional instructions, to deliberate, or to alter or amend its verdict. *Cf. Dawkins*, 32 S.C. at 26, 10 S.E. at 773 ("After a jury [has] rendered [its] verdict, and [has] been discharged, we know of no authority by which [it] can be reimpaneled, and, *under further instructions*, be called upon to render *a new and different verdict*." (emphasis added)).  Instead, the jury here simply confirmed that it reached a guilty verdict on the armed robbery charge prior to its discharge. *See Myers*, 318 S.C. at 552, 459 S.E.2d at 305 ("[R]eassembly in this case served *not to amend or alter the jury's verdict, but to reflect the actual verdict reached*." (emphasis added)).

The trial court thoroughly polled the jury, collectively and individually, to ensure that the guilty verdict on the armed robbery charge was reached prior to discharge and that it remained the jury's verdict.  The jury merely ratified what it had already done prior to discharge.  Under these circumstances, the trial court acted well within its discretion in recalling the jury and receiving the verdict the jury reached pre-discharge.  Indeed, the trial court's deft handling of this situation was textbook.

## C.

Going forward, before entering a verdict against a criminal defendant under these unusual circumstances, trial courts must be firmly convinced that (1) the verdict was reached prior to discharge *and* (2) the jury was not subjected to outside influences in the time between discharge and reassembly.  If these facts are not firmly

---

[8] The jury was dismissed at 4:35 p.m., and the trial court went back on the record at 4:58 p.m. to report all twelve jurors had returned to the jury room.  Of course, the jurors were located and brought back some time before 4:58 p.m., that is, before the trial court went back on the record.

established, the trial court shall honor the prior discharge and not proceed further.

## D.

Here, in sum, the jury was dispersed for a very brief period between discharge and reassembly, and there was no evidence the jury was subject to outside influences. Upon reassembly, through careful scrutiny by the trial court and thorough polling, the jury simply ratified the guilty verdict it reached prior to discharge. Therefore, "*Under the limited factual circumstances presented*, we find no abuse of discretion in recalling the jury to permit it to accurately report its true verdict." *Id.* (emphasis added). Accordingly, we uphold Petitioner's conviction and sentence for armed robbery. The decision of the court of appeals is affirmed in result.

**AFFIRMED IN RESULT.**

**BEATTY, C.J., FEW, JAMES and HILL, JJ., concur.**